**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| AMERICAN APPAREL, LLC, *et al.*,[1] | : | Case No. 16-12551 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| | : | |
| STANDARD GENERAL L.P., | : | |
| STANDARD GENERAL MASTER FUND, | : | |
| L.P., and P STANDARD GENERAL LTD., | : | Adv. Pro. No. _____ |
| | : | |
| Plaintiffs, | : | **COMPLAINT AND** |
| | : | **OBJECTION TO CLAIMS** |
| - against - | : | |
| | : | |
| MONARCH MASTER FUNDING, LTD., | : | |
| COLISEUM CAPITAL PARTNERS, L.P., | : | |
| BLACKWELL PARTNERS, LLC, | : | |
| COLISEUM CAPITAL PARTNERS II, L.P.,: | | |
| GOLDMAN SACHS TRUST – GOLDMAN | : | |
| SACHS HIGH YIELD FLOATING RATE | : | |
| FUND, GOLDMAN SACHS LUX | : | |
| INVESTMENT FUNDS – GOLDMAN | : | |
| SACHS LUX INVESTMENT FUNDS – | : | |
| GOLDMAN SACHS HIGH YIELD | : | |
| FLOATING RATE PORTFOLIO (LUX), | : | |
| GOLDMAN SACHS LUX INVESTMENT | : | |
| FUNDS – GLOBAL MULTI-SECTOR | : | |
| CREDIT PORTFOLIO (LUX), GLOBAL | : | |
| OPPORTUNITIES, LLC, GLOBAL | : | |
| OPPORTUNITIES OFFSHORE LTD., | : | |
| PWCM MASTER FUND LTD., OCEAN | : | |
| MASTER FUND LTD., AAI PENTWATER | : | |
| FUND PUBLIC LIMITED CO., LMA SPC, | : | |

---

[1]  The debtors in these Chapter 11 cases are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Apparel, LLC (0601); American Apparel (USA), LLC (8940); American Apparel Retail, Inc. (7829); American Apparel Dyeing & Finishing, Inc. (0324); KCL Knitting, LLC (9518); and Fresh Air Freight, Inc. (3870) (collectively, the **"Debtors"** or the **"Company"**). The address of each is 747 Warehouse Street, Los Angeles, California 90021.

PENTWATER EVENT DRIVEN  :
CAYMAN FUND LTD., and  :
WILMINGTON TRUST, NATIONAL :
ASSOCIATION,    :
         :
    Defendants.  :
         :

  Standard General L.P., Standard General Master Fund, L.P., and P Standard General Ltd. (collectively "**Standard General**" or "**Plaintiffs**"), by and through their undersigned counsel, hereby file this complaint (the "**Complaint**") and objection to claims (the "**Objection**") against defendants Monarch Master Funding Ltd., Coliseum Capital Partners, L.P., Blackwell Partners, LLC, Coliseum Capital Partners II, L.P., Goldman Sachs Trust – Goldman Sachs High Yield Floating Rate Fund, Goldman Sachs Lux Investment Funds – Goldman Sachs High Yield Floating Rate Portfolio (LUX), Goldman Sachs Lux Investment Funds – Global Multi-Sector Credit Portfolio (LUX), Global Opportunities LLC, Global Opportunities Offshore Ltd., PWCM Master Fund Ltd., Ocean Master Fund Ltd., AAI Pentwater Fund Public Limited Co., LMA SPC, Pentwater Event Driven Cayman Fund Ltd. (collectively, with their representatives and advisors, the "**Lender Committee**"), and Wilmington Trust, National Association as Administrative Agent (in such capacity, the "**Prepetition Agent**," and together with the Lender Committee, the "**Defendants**"), and allege as follows:

## <u>NATURE OF THE ACTION</u>

  1.  Standard General brings this Complaint and Objection to correct Defendants' repeated and egregious breach of their contractual obligations to Standard General under the Prepetition Credit Agreement[2] and Defendants' abuse of their position to attempt to obtain greater priority and security for their claims than that contract or the law allow.  The members of

---

[2] Capitalized terms not defined in this section shall have the meanings ascribed to them in the subsequent sections of the Complaint.

the Lender Committee, the Prepetition Agent, and the Debtors[3] are parties to the Prepetition Credit Agreement.

2.     This is a dispute among lenders that are parties to the Prepetition Credit Agreement.  Under that agreement, Standard General agreed with the other four lenders, who together comprise the Lender Committee, to set clear limits on how much debt could be added to the Company's capital structure and whose consent was required to add to it.  The members of the Lender Committee have completely disregarded those limits in an effort to protect or advance their own investment, to the detriment of Standard General and the Company.

3.     Together, the members of the Lender Committee hold 80% of the debt under the Prepetition Credit Agreement and more than 90% of the equity in the Company, and they control the Company's board.  The Lender Committee members' investments do not mean, however, that they can act unilaterally and without regard for their commitments – even though that is exactly what they have done.

4.     Standard General's dispute with the Defendants arises from the commitments and representations that the Lender Committee and its representatives made to Standard General and the Company in connection with the Company's emergence from its first bankruptcy in February 2016.  At that time, the Lender Committee and its representatives repeatedly avowed that they were committed to assisting the Company's recovery.  The Lender Committee not only supported the Company's plan of reorganization, but reassured Standard General and the Debtors that it was fully committed to the Company's turnaround and strategic plan, which required

---

[3]     American Apparel (USA), LLC, American Apparel Retail, Inc., American Apparel Dyeing & Finishing, Inc. and KCL Knitting, LLC were all borrowers under the Prepetition Credit Agreement, and American Apparel, LLC and Fresh Air Freight, Inc. were guarantors under the same.  All Debtors signed each purported Amendment to the Prepetition Credit Agreement.

substantial investments of equity beyond the plan commitments. The Lender Committee understood that substantial further funding was necessary to right-size the cost structure by exiting the knitting and dyeing business, fixing the Company's global supply chain, and relocating the Company's cutting and sewing operations. Based on the Lender Committee's representations, as well as its own commitment to the Company, Standard General agreed to contribute funds to the Company under the Prepetition Credit Agreement and agreed to waive certain defaults under its loan to the Company's UK affiliate (for which loan the Company reinstated its guarantee).

5.     Instead of following through on its commitments in connection with the plan and Prepetition Credit Agreement, the Lender Committee abruptly changed direction. As the Company's financial distress continued after its exit from its first bankruptcy, the members of the Lender Committee abandoned their commitment to support the turnaround plan, which required new equity, and began to layer in high-rate, high-fee debt ahead of Standard General, in direct contravention of the plain terms of the Prepetition Credit Agreement. Instead of improving the Company's business operations, it appeared that the Lender Committee intended to extract a disproportionate share of the value of the Company via its predatory high-rate, high fee related-party loans, with an eye toward additional value recovery through a potential sale if a new buyer could be found.

6.     In total, the Lender Committee caused the Company to incur $82 million of additional debt between April and October 2016 through Amendments to the Prepetition Credit Agreement. The Amendments – nine in total – effectively took two tacks. First, the Amendments sought to eviscerate the detailed regime for priority of payments set forth in the Prepetition Credit Agreement by shoehorning in a new section of the Prepetition Credit

Agreement, with a totally different regime, that purported to apply to distributions prior to the agreed-upon waterfall provisions of the Prepetition Credit Agreement kicking in.  Second, the Amendments purported to increase the dollar limit of indebtedness under a "Revolving Facility" permitted under the Prepetition Credit Agreement, under the guise that the Purported Priming Loans constituted such facility – notwithstanding that the loans at issue clearly do not meet the requirements set forth for such a facility in the Prepetition Credit Agreement.

7.      The Purported Priming Loans violated the terms of the Prepetition Credit Agreement because Standard General's consent is required under the Prepetition Credit Agreement to subordinate its Exit Loan, or the liens securing that loan, to such new indebtedness, or to alter priority of payment provisions of the Prepetition Credit Agreement.

8.      In addition, the Purported Priming Loans were entered into on a piecemeal, ad hoc basis (sometimes only one week apart), at a time when the Company was rapidly losing funds and, upon information and belief, was unable to pay its debts as they came due.  The Company should have been preparing for a second bankruptcy filing, instead of digging itself further into debt.  The Purported Priming Loans were part of an ill-fated attempt to prolong the Company's business without adequate working capital, while searching for a buyer that would allow the Lender Committee to turn a profit on its investment.  This was a strategy that Defendants knew or should have known was doomed to fail, with the costs of failure imposed on other creditors, customers, and the Company's employees at the same time that Defendants benefited by charging fees and interest for themselves while they created optionality for the benefit of their equity position.  This type of "Hail Mary" pass is inequitable, as recognized by Delaware law.

9.      Defendants' inequitable treatment of Standard General continued as the Debtors filed their second round of chapter 11 cases.  Initially, the terms of the proposed debtor-in-possession ("**DIP**") loan, which was negotiated by the Debtors, the DIP lender and the Lender Committee, provided that certain DIP liens would have first-lien priority in the same collateral securing the Exit Loans – even though Standard General did not consent to the priming of any of the liens securing its Exit Loan.  Standard General objected and, after lengthy negotiations, the parties ultimately arrived at an agreement whereby Standard General consented to the priming of its interests in certain collateral, but did not consent to the priming of its interest in other collateral, which was carved out of the priming DIP liens.  The parties also agreed to preserve all of Standard General's rights to challenge the validity, enforceability and priority of the claims of the Lender Committee, subject to procedures set forth in the final DIP order, as described below.

10.      The final DIP order also contains stipulations of the Debtors as to, among other things, the validity, enforceability and priority of the obligations purportedly owed by the Debtors to the Lender Committee, including the Purported Priming Loans.  Those stipulations will become binding, and the claims, liens and security interests of the Prepetition Secured Parties, including the Lender Committee, will become finally allowed unless a party in interest, including Standard General, has commenced a "Challenge" to such claims on or before January 23, 2017.  This Complaint is Standard General's Challenge as required by the final DIP order.

* * *

11.      In light of the Debtors' second chapter 11 filing, the Purported Priming Loans have become a critical issue.  The Debtors' collateral appears unlikely to yield sufficient proceeds to pay all of the Exit Loans, let alone the Exit Loans plus the Purported Priming Loans.  As a result, the priority of payments and liens as among the Prepetition Secured Lenders will determine the extent of Standard General's recovery.

12.     Both prior to and during the Debtors' current bankruptcy, the Lender Committee has repeatedly acted in disregard of Standard General, trampled over Standard General's contractual rights and interests, and ignored Standard General's status as an equal lender under the Prepetition Credit Agreement.  Standard General remains entitled to its first priority share of any recovery from the proceeds of its collateral under the Prepetition Credit Agreement – and the Lender Committee should not profit from its deceitful and inequitable behavior.  Accordingly, Standard General now seeks relief from this Court, and rulings: (i) invalidating, recharacterizing, subordinating and/or disallowing the claims of Defendants for the Purported Priming Loans; (ii) subordinating any and all other claims of Defendants; (iii) awarding Standard General damages for the Defendants' breach of the Prepetition Credit Agreement and the implied covenant of good faith and fair dealing under the same; and (iv) granting such other and further relief the Court deems proper under the circumstances.

## THE PARTIES

13.     Plaintiff Standard General L.P. is a limited partnership, organized and existing under the laws of Delaware, with its principal place of business in New York, NY.  Standard General L.P. is an investment firm that manages event-driven opportunity funds that focus on highly-leveraged middle-market companies that are undergoing dramatic change or disruption. Standard General L.P. was founded in 2007 and has been a SEC-registered investment adviser since 2009.

14.     Plaintiff Standard General Master Fund, L.P. is a limited partnership, organized and existing under the laws of the Cayman Islands, with its principal place of business in New York, NY.  Standard General Master Fund, L.P. is a private investment vehicle managed by Standard General L.P.

15.     Plaintiff P Standard General Ltd. is a business company organized and existing under the laws of the British Virgin Islands, with its principal place of business in New York, NY.  P Standard General Ltd. is a private investment vehicle managed by Standard General L.P.

16.     Defendant Monarch Master Funding Ltd. is a Cayman Islands limited company, with its principal place of business located at 535 Madison Avenue, New York, NY 10022.

17.     Defendant Coliseum Capital Partners, L.P. is a Delaware limited partnership, with its principal place of business located at Metro Center, 1 Station Place, 7th Floor South, Stamford, CT 06902.

18.     Defendant Blackwell Partners, LLC, Series A is a Delaware limited liability company, with its principal place of business located at 324 Blackwell Street, Suite 52, Durham, NC 27701.

19.     Defendant Coliseum Capital Partners II, L.P. is a Delaware limited partnership, with its principal place of business located at Metro Center, 1 Station Place, Stamford, CT 06902.

20.     Defendant Goldman Sachs Trust – Goldman Sachs High Yield Floating Rate Fund is a Delaware trust, with its principal place of business located at 200 West Street, New York, NY 10282.

21.     Defendant Goldman Sachs Lux Investment Funds – Goldman Sachs High Yield Floating Rate Portfolio (LUX) is a Luxembourg fund, with its principal place of business located at 49, avenue J.F. Kennedy, Luxembourg, LU-LU, L-1855.

22.     Defendant Goldman Sachs Lux Investment Funds – Global Multi-Sector Credit Portfolio (LUX) is a Luxembourg fund, with its principal place of business located at 49, avenue J.F. Kennedy, Luxembourg, LU-LU, L-1855.

23.     Defendant Global Opportunities, LLC is a Delaware limited liability company, with its principal place of business located at 200 West Street, New York, NY 10282.

24.     Defendant Global Opportunities Offshore, Ltd. is a Cayman Islands limited company, with its principal place of business located at 200 West Street, New York, NY 10282.

25.     Defendant PWCM Master Fund Ltd. is a Cayman Islands limited company, with its principal place of business located at 614 Davis Street, Evanston, IL 60201.

26.     Defendant Oceana Master Fund Ltd. is a Cayman Islands limited company, with its principal place of business located at Walker House, 87 Mary Street, George Town KY1-9005, Cayman Islands.

27.     Defendant AAI Pentwater Fund Public Limited Co. is a limited company organized and existing under the laws of Ireland, with its principal place of business located at Beaux Lane House, 2nd floor, Mercer Street Lower, Dublin 2, Ireland.

28.     Defendant LMA SPC for and on behalf of Map 98 Segregated Portfolio is a segregated portfolio company organized and existing under the laws of the Cayman Islands, with its principal place of business located at 3801 PGA Boulevard, Suite 500, Palm Beach Gardens, FL 33410.

29.     Defendant Pentwater Event Driven Cayman Fund Ltd. is a Cayman Islands limited company, with its principal place of business located at 89 Nexus Way, Camana Bay KY1-1205, Cayman Islands.

30.     Defendant Wilmington Trust, National Association is a national banking association, with its principal place of business located at 1100 North Market Street, Wilmington, DE 19890.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

32.     This adversary proceeding is brought pursuant to Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), sections 105(a), 501(c), 502, and 510 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and applicable state laws to recover damages from Defendants for breach of contract and breach of the implied covenant of good faith and fair dealing.

33.     Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

34.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (K).  Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to entry of final orders or judgments by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

35.     This adversary proceeding constitutes Standard General's Challenge under the interim and final DIP orders to the enforceability, validity, priority and amount of the claims of the Lender Committee, and the allowance of such claims, including the Lender Committee's claims for the Purported Priming Loans.

36.     This Court has personal jurisdiction over each Defendant pursuant to Rule 7004 of the Bankruptcy Rules.

## FACTS

A.    **The Lender Committee's Representations in Connection with the Company's Emergence from Its First Bankruptcy**

37.    Prior to the Company's emergence from its first bankruptcy in February 2016, its management team repeatedly informed the Lender Committee that executing a complete turnaround plan to fully maximize enterprise value and reduce the known risks that existed in relation to the Company's business plan would require a substantial equity investment beyond the new capital contemplated by the Company's plan of reorganization.  This money would be used primarily to exit the knitting and dyeing business, fix the global supply chain, and relocate the cutting and sewing operations from California to the southeastern United States.

38.    The Lender Committee and its representatives assured Standard General that they were committed to pursuing a complete operational turnaround for the Company and investing further in the business.  Such assurances helped Standard General get comfortable with signing on to the restructuring support agreement in the prior bankruptcy case, agreeing to convert its DIP loans in that case to an Exit Loan under that certain credit agreement dated February 5, 2016 (the "**Prepetition Credit Agreement**"), and invest new money in the Company at that time – as well as reinstate its loan to the Company's UK affiliate.

39.    During this time, the Lender Committee emphasized that its first priority was getting the Company out of bankruptcy as quickly as possible, and then effectuating an operational turnaround to revitalize the ailing Company.  Upon information and belief, the Lender Committee sought such a quick exit from bankruptcy in the hopes of securing a deal with a potential purchaser for the reorganized entity, which offered them the promise of a quick profit at a premium price.

B.      **The Prepetition Credit Agreement**

40.     Predicated upon the Lender Committee's assurances that it intended to implement an operational turnaround in addition to the business plan contemplated by the Company's plan of reorganization, Standard General agreed to fund an Exit Loan to the Company pursuant to the Prepetition Credit Agreement.  Standard General contributed 20% – $25.8 million – of the $129 million of Exit Loans provided in total by Standard General and the Lender Committee (together, the "**Prepetition Secured Lenders**").

41.     The Prepetition Credit Agreement provides that the Prepetition Secured Lenders' loans are secured by a first priority lien on substantially all assets of the Debtors (the "**Prepetition Collateral**"), subject to certain permitted liens.  *See* Ex. A, Prepetition Credit Agreement § 2.14(a).  The maturity date under the Prepetition Credit Agreement is February 5, 2020.  *See id.* at 17 & § 2.01(a).

42.     The Prepetition Credit Agreement details the priority of payment upon any Event of Default (as defined therein) with respect to proceeds of the Prepetition Collateral securing the Exit Loans:  (i) first, to payment of any indemnities and expenses owed to the Prepetition Agent; (ii) second, to payment of any indemnities and expenses owed to the Prepetition Secured Lenders; (iii) third, to payment of any accrued and unpaid interest, fees and premiums owed to the Prepetition Secured Lenders; (iv) fourth, to the payment of unpaid principal of the loans made pursuant to the Prepetition Credit Agreement, ratably among the holders thereof; (v) fifth, to the payment of all other Obligations (as defined in the Prepetition Credit Agreement); and (vi) sixth, to the borrowers, should any balance remain after all of the Obligations have been indefeasibly paid in full.  *See* Ex. A, Prepetition Credit Agreement § 8.03.

43.     The Prepetition Credit Agreement provides that certain amendments require the consent of 100% of the Prepetition Secured Lenders.

44.     Specifically, Section 10.01 of the Prepetition Credit Agreement provides:

**10.01 Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrowers or any other Credit Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Credit Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

. . .

 (d) (i) **change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby or the order of the application of payments thereunder**, in each case, *without the written consent of each Lender* or (ii) change Section 2.05 in a manner that would alter the pro rata sharing of Commitments reductions required thereby without the written consent of each Lender affected thereby;

(e) **change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights** hereunder or make any determination or grant any consent hereunder *without the written consent of each Lender*; or

(f) (i) release all or substantially all of the Collateral in any transaction or series of related transactions, (ii) release all or substantially all of the Guarantors party to the Credit Party Guarantees, (iii) **subordinate the Obligations hereunder to any other Indebtedness** or (iv) except as provided by operation of applicable law, **subordinate the Liens on all or substantially all of the Collateral** granted in favor of the Administrative Agent for itself and the other Secured Parties under the Security Documents to any other Lien, in each case, *without the written consent of each Lender.*

Ex. A, Prepetition Credit Agreement § 10.01 (emphases added). Thus, the pro rata sharing of payments, the order of application of payments, as set forth in the Prepetition Credit Agreement, and the subordination of obligations thereunder, cannot be effectuated without the "written consent of each Lender."

45.     In addition to the $129 million in Exit Loans, the Prepetition Credit Agreement also permits the Company to incur indebtedness under a "Revolving Facility" not to exceed $40 million. The Prepetition Credit Agreement defines "Revolving Facility" as a separate revolving credit facility, or, with the consent of the "Required Lenders" (defined in the Prepetition Credit Agreement as lenders holding more than 50% of the sum of the outstanding Exit Loans), a term loan facility subject to a minimum collateral coverage requirement. *See* Ex. A, Prepetition Credit Agreement § 7.02(j). The Revolving Facility would be entitled to a first priority lien in certain of the Prepetition Secured Lenders' collateral. *Id.* at 20 & § 7.03(xiv). The Prepetition Credit Agreement further specifies that an intercreditor agreement would be entered into setting forth various lien positions and other intercreditor issues as between the Revolving Facility and the Prepetition Credit Agreement.

### C.     The Lender Committee's Failed Plan to Turn a Quick Profit from a Sale Leads to the Amendments to the Prepetition Credit Agreement

46.     Upon information and belief, the Lender Committee was unsuccessful in securing a deal with a potential buyer for the Company to turn a quick profit on its investment in the Company following its exit from its first bankruptcy.

47.     Without another potential purchaser in sight – and without an equity infusion that would have allowed the Company to implement a complete operational turnaround – the financial health of the Company continued to plummet. Although the Debtors' first day filings in their second bankruptcy cases suggest that the Company's financial position rapidly and

unexpectedly deteriorated following emergence, the Company merely continued on the same downward trajectory it had been on prior to its exit from bankruptcy.  The 31% full-year 2016 decline prior to the second bankruptcy filing is consistent with the Company's prior financials.

48.     The Lender Committee did not pursue any operational or transactional solution to the Company's financial woes other than to attempt to find a new purchaser for the Company. During this time, several members of the Company's senior management team resigned – including the Chief Executive Officer, Paula Schneider, and the Chief Financial Officer, Hassan Natha.  *See* Weinstein First Day Decl. ¶ 34.  [D.I. 24].  In her September 2016 resignation letter, the former CEO cited the Company's large debts and stated that the "sale process currently under way for all or part of the company may not enable us to pursue the course of action necessary for the plan to succeed nor allow the brand to stay true to its ideals."

49.     Because of the Company's poor financial performance, the Company also could not find a third party to provide a revolving credit facility that would support the Company's daily working capital needs.  *See id.* ¶ 12.  As noted above, the Prepetition Credit Agreement provided for the possibility of a Revolving Facility, not to exceed $40 million, which would be entitled to a first priority lien in certain of the Prepetition Secured Lenders' collateral.  *See* Ex. A, Prepetition Credit Agreement at 15, 23 & §§ 2.14, 6.12(c), 7.02(j), 7.03(xiv).

50.     Upon information and belief, the Company's management informed the Lender Committee that without the materialization of a new buyer or a Revolving Facility, and without the Lender Committee's promised equity investment to backstop the Company, the Company would continue to burn money and ultimately spiral into bankruptcy.  Instead of showing its commitment to the Company's turnaround by putting forward the critical equity necessary for a successful turnaround, a mere *two months* after emergence the Lender Committee embarked on a

series of amendments (collectively, the "**Amendments**") that put in place approximately $82 million of additional "loans" under the Prepetition Credit Agreement (the "**Purported Priming Loans**").   Upon information and belief, the Lender Committee accompanied each Purported Priming Loan with a purported amendment to the Prepetition Credit Agreement – without Standard General's consent and in many cases without even providing Standard General notice – and declined to put any equity into the Company because it believed that a second bankruptcy filing was inevitable and that it would never recover any of its investments if it contributed equity.

51.     In total, there were nine Amendments to the Prepetition Credit Agreement, all of which were entered into solely among the Company, the Prepetition Agent, and the Lender Committee.  The Company did not pledge any new collateral to support the Purported Priming Loans.  Instead, it pledged the same collateral securing the Exit Loans under the Prepetition Credit Agreement to secure all additional purported debt incurred pursuant to the Amendments.

52.     On or about April 5, 2016, the Company entered into an amendment (the "**First Amendment**") to the Prepetition Credit Agreement with the Lender Committee to borrow $4 million through short-term loans due by July 5, 2016.  These loans purported to have "first out" rights with respect to the accounts and inventory collateral ("**Accounts/Inventory Collateral**") that had been pledged under the Prepetition Credit Agreement, and purported to undercut the provision of the Prepetition Credit Agreement that dictated the order of distributions from collateral upon an Event of Default, Section 8.03, by inserting an additional provision, Section 2.01(c)(vii), that would apply *prior* to Section 8.03.  *See* Ex. B, First Amendment Agreement § 2.01(c)(vii).

53.    The First Amendment thus provided that, following payment of certain fees due to the Administrative Agent and the payment of indemnities and expenses to the Prepetition Secured Lenders, any monies realized from the Accounts/Inventory Collateral – which were already pledged to secure the Exit Loans under the Prepetition Credit Agreement – would be used first to repay any unpaid principal of the $4 million loan extended under the First Amendment. *See id.* §§ 2.01(c)(vii)(3), (4).[4]  Standard General did not enter into or consent to the First Amendment.  In fact, Standard General was not even aware of the amendment until after it had been executed.

54.    The First Amendment was soon followed by a second amendment (the "**Second Amendment**") to the Prepetition Credit Agreement on May 11, 2016, which provided $5 million of additional short-term loans to the Company from the Lender Committee due July 5, 2016. *See* Ex. C, Second Amendment Agreement § 2.01(c)(i).  The Second Amendment further provided that each member of the Lender Committee may, in its sole discretion, make an additional loan or loans up to the amount set forth in Annex B opposite each Lender Committee member's name for a total amount of $33 million of additional loans. *See id.* § 2.01(c)(i) & Annex B.

55.    The Second Amendment further amended new Section 2.01(c)(vii), regarding distributions of monies from collateral following an Event of Default. *See id.* § 2.01(c)(vii).  Such amendment provided that the loans made pursuant to the Second Amendment would (following payment of certain fees due to the Administrative Agent and the payment of indemnities and expenses to the Prepetition Secured Lenders), along with the First Amendment

---

[4]    In addition, the First Amendment expanded the definition of "Loans" under the Prepetition Credit Agreement, to include not only the Exit Loans, but also the Purported Priming Loans made pursuant to the First Amendment.  Because the definition of "Required Lenders" under the Prepetition Credit Agreement is "Lenders holding more than 50% of the sum of the (a) outstanding *Loans* and (b) aggregate unused Commitments," the effect of amending the definition of "Loans" was to change the definition of "Required Lenders."

loans, receive priority of payment from any monies realized from the Accounts/Inventory Collateral, ahead of the Exit Loans under the Prepetition Credit Agreement. *See id.* §§ 2.01(c)(vii)(3), (4).

56.     The Second Amendment was followed by a third amendment (the "**Third Amendment**") to the Prepetition Credit Agreement on July 5, 2016, which extended the term of the loans under the First and Second Amendments to August 5, 2016. *See* Ex. D, Third Amendment Agreement § 2(a).

57.     On July 12, 2016, the Company, the Prepetition Agent, and the Lender Committee entered into a fourth amendment (the "**Fourth Amendment**") to the Prepetition Credit Agreement, which provided that the members of the Lender Committee could make up to $7 million of additional loans to the Company. *See* Ex. E, Fourth Amendment Agreement § 2(a) & Annex B. The Fourth Amendment also purported to increase the total amount of permissible indebtedness under a Revolving Facility from $40 million to $47 million – for the first time exceeding the amount that had initially been contemplated if the Company had obtained the Revolving Facility on the terms that had been planned. *See id.* § 2(b).

58.     On August 5, 2016, the Company, the Prepetition Agent, and the Lender Committee entered into a fifth amendment (the "**Fifth Amendment**") to the Prepetition Credit Agreement, which provided for an additional $13 million in loans to the Company by the Lender Committee. *See* Ex. F, Fifth Amendment Agreement § 2(a) & Annex B.  The Fifth Amendment further purported to increase the total amount of permissible indebtedness under the alleged Revolving Facility pursuant to Section 7.02(j) of the Prepetition Credit Agreement from $47 million to $60 million, *see id.* § 2(c), and extended the maturity date of all loans pursuant to the Amendments to September 6, 2016. *See id.* § 2(b).

59.     On September 6, 2016, the Company, the Prepetition Agent, and the Lender Committee entered into a sixth amendment (the "**Sixth Amendment**") to the Prepetition Credit Agreement.  The Sixth Amendment provided for a new $5 million loan (the "**IP Priming Loan**"), which was purportedly secured by a first priority lien on 35% of the Company's intellectual property collateral (the "**IP Collateral**") – all of which had already been pledged to secure the Exit Loans under the Prepetition Credit Agreement.  *See* Ex. G, Sixth Amendment Agreement § 2.01(d) & Annex B.  The Sixth Amendment *further* extended the maturity date of all loans pursuant to the Amendments to October 30, 2016.  *See id.* § 2.01(c)(i).  In addition, the Sixth Amendment purported to amend Section 7.02(j) of the Prepetition Credit Agreement, regarding Permitted Indebtedness, to now permit not only (i) the Revolving Facility, further increased to $60,000,000, but also (ii) a second revolving credit facility, up to an amount of $5,000,000.67.  *See id.* § 7.02(j).

60.     On September 20, 2016, the Company, the Prepetition Agent, and the Lender Committee entered into a seventh amendment (the "**Seventh Amendment**") to the Prepetition Credit Agreement, which increased the amount of the IP Priming Loans from $5 million to $10 million, once more without Plaintiffs' consent.  *See* Ex. H, Seventh Amendment Agreement § 2(a) & Annex B.  The Seventh Amendment also purported to amend Section 7.02(j)(ii) of the Prepetition Credit Agreement to increase the permissible amount of the *second* revolving credit facility from $5,000,000.67 to $10,000,000.67.  *Id.* § 2(c).

61.     On September 28, 2016, the Company, the Prepetition Agent, and the Lender Committee entered into an eighth amendment (the "**Eighth Amendment**") to the Prepetition Credit Agreement, which provided for a further increase in the IP Priming Loans from $10 million to $20 million.  *See* Ex. I, Eighth Amendment Agreement § 2(a) & Annex B.  This

amendment purported to further increase the permissible amount of indebtedness under the newly created second revolving credit facility from $10,000,000.67 to $20,000,000.67.  *See id.* § 2(c).

62.     On October 21, 2016, the Company, the Prepetition Agent, and the Lender Committee entered into a ninth amendment (the "**Ninth Amendment**") to the Prepetition Credit Agreement, which provided for yet another increase in the IP Priming Loans from $20 million to $25 million.  *See* Ex. J, Ninth Amendment Agreement § 2(a) & Annex B.  The Ninth Amendment further extended the maturity date for all of the Purported Priming Loans, from October 30, 2016 to November 30, 2016, *see id.* §§ 2(b), (c), and altered Section 7.02(j)(ii) of the Prepetition Credit Agreement again, to purportedly increase the permissible amount of the newly-created *second* revolving credit facility to $25,000,000.67.  *See id.* § 2(d).

63.     The Purported Priming Loans purported to grant priming liens to the Lender Committee on substantially all of the collateral securing the Exit Loans under the Prepetition Credit Agreement.

64.     None of these Purported Priming Loans satisfied the Prepetition Credit Agreement's requirements for a Revolving Facility.  First, the Prepetition Credit Agreement explicitly states that Purported Priming Loans that are "borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed" – a concept antithetical to the nature of a *revolving* credit facility.  *See, e.g.*, Prepetition Credit Agreement § 2.01 ("Any Loans borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed"); Ex. G, Sixth Amendment Agreement § 2.01(d)(v) ("Any IP Additional Loans borrowed and subsequently repaid or prepaid, in whole or in part, may not be reborrowed.").  Second, the Purported Priming Loans do not constitute a "term loan facility" as contemplated by Section 7.02(j) because they

were not subject to a minimum collateral coverage requirement as explicitly required by that section of the Prepetition Credit Agreement. *See* Ex. A, Prepetition Credit Agreement § 7.02(j). Third, Defendants never entered into a separate intercreditor agreement setting forth the priorities between any such revolving facility and the Exit Loans as required by the Prepetition Credit Agreement, but rather purported that their own Amendments to the Prepetition Credit Agreement constituted the requisite intercreditor agreement. *See* Ex. B, First Amendment Agreement § 2.01(c)(v). In addition, the Purported Priming Loans far exceeded the $40 million limit on the Revolving Facility pursuant to the Prepetition Credit Agreement's express terms. *See* Ex. A, Prepetition Credit Agreement § 7.02(j).

### D.    The Circumstances Surrounding the Purported Priming Loans Demonstrate Defendants' Knowledge of Their Invalidity

65.    Defendants entered into the Purported Priming Loans in secret and without full disclosure to interested parties or the appropriate notice required under the Prepetition Credit Agreement. *See* Ex. A, Prepetition Credit Agreement § 6.05. Defendants not only failed to invite Standard General to participate in the funding provided in the majority of the Amendments, but neglected to even notify Standard General before the majority of the Amendments were entered into, let alone seek Standard General's required consent for any of the Amendments – even though the Amendments purport to effect changes that subordinate Standard General's debt and liens under the Prepetition Credit Agreement to other indebtedness and other liens, and alter the priority of payments under the Prepetition Credit Agreement.

66.    The Lender Committee's knowledge that the Purported Priming Loans violated the Prepetition Credit Agreement was evident from its dealings with Standard General. In September 2016, the Lender Committee offered Standard General the opportunity to purchase its pro rata share of the Purported Priming Loans under the then-existing Amendments on the same

economic terms as the Lender Committee, but predicated that offer on Standard General consenting to the validity and priority of the Purported Priming Loans under the previous Amendments and waiving any claims against the Lender Committee with respect to those Amendments.

67.    The Lender Committee seemingly attempted to justify the Amendments as somehow comprising the Revolving Facility permitted under the Prepetition Credit Agreement. This is fundamentally in conflict with the express terms of the Prepetition Credit Agreement and the parties' intent.  The Revolving Facility was never intended to fund the turnaround plan and planned relocation of the Company's manufacturing operations. The Revolving Facility was supposed to permit the Company to purchase inventory and fund daily working capital swings. The Purported Priming Loans went well beyond that and did not satisfy the requirements of the Revolving Facility.

E.    **Standard General Voices Its Concerns Regarding the Company's Direction and the Purported Priming Loans**

68.    As Standard General learned about the Company's rapidly declining financial health, lack of a realistic recovery strategy, and continued incurrence of debt toward no end, it repeatedly approached the Lender Committee and its advisors to try to discuss the path forward and to offer to help fund a viable turnaround plan – and objected to the Lender Committee's attempts to subordinate Standard General's Exit Loan to new debt.  The Lender Committee rebuffed these efforts: the members were no longer interested in a turnaround, but rather, were laser-focused on extricating themselves from the situation without liability.

69.    Between July and November 2016, Standard General repeatedly spoke to representatives of the Defendants and the Company in order to discuss the Company's financial health and strategic direction.  Standard General also expressed its concern about the Lender

Committee's actions, which served to dig the Company deeper into debt via ad hoc funding from which the Lender Committee members themselves stood to benefit – by operation of the purported priming liens they granted to themselves for their "investments." At the same time, the Company continued to burn millions of dollars a week while limping along on the patchwork life support offered by the Purported Priming Loans. The delay in filing for bankruptcy, while incurring additional debt, further harmed the Company and its creditors at a critical time. These actions were a gross abdication of the directors' and officers' fiduciary duties, and the members of the Lender Committee aided and abetted such behavior by entering into these self-dealing transactions.

70. When Standard General asked the Lender Committee and its representatives why they continued to operate the factory located in Los Angeles despite its staggering weekly losses, it was told that they needed to keep it running in case a potential buyer expressed interest. When Standard General asked if any buyer had ever expressed interest in keeping the highly unprofitable facility open, Standard General was told no, but that it was a theoretical possibility that a potential buyer for the factory could appear.

71. To avoid any public backlash from closing the factory, the Lender Committee simply sought to impose those costs on Standard General and other creditors and constituents of the Company, while protecting itself through its purported priming scheme.

72. Standard General made numerous requests for books and records of the Company relating to Company operations and the Purported Priming Loans, including board minutes, board materials or presentations, financial statements and projections, and other strategic planning documents, which it is entitled to pursuant to the Company's Operating Agreement as an equity holder of the Company and as a lender under the Prepetition Credit Agreement. Its

requests were generally ignored or dismissed or responded to with stale and incomplete information.

73.     On September 9, 2016, following the Company's entry into the Sixth Amendment, Standard General sent a letter to the Company's board of directors expressing its growing concern regarding the Company's financial health and the Lender Committee's actions on behalf of the Company.  Specifically, Standard General objected to the Company's lack of transparency about potentially significant transactions and matters that would impact the Company and Standard General, including the Company's poor financial performance, previous financings and the use of funds from those financings, the resignation of the chairman of the Company's board of directors and the Company's Chief Financial Officer, and the engagement of a financial advisor, Houlihan Lokey Capital, Inc. ("**Houlihan**"), to conduct a sale process for the Company.  *See* Ex. K, Letter from Shannon Selden, Debevoise & Plimpton LLP, to the Board of Directors of American Apparel, LLC (Sept. 9, 2016).

74.     Standard General also objected to the Amendments entered into by Defendants as of that date, including to the extent that they purported to grant priming liens on the same collateral securing Standard General's Exit Loan and to subordinate Standard General's Exit Loan without its consent.  *Id.*

75.     Standard General received a response letter from counsel for the Company, claiming that the Company had been working cooperatively with Standard General as the Company explored strategic processes.  *See* Ex. L, Letter from Scott J. Greenberg, Jones Day, to Shannon Selden, Debevoise & Plimpton LLP (Sept. 9, 2016).  Counsel for the Company also asserted in conclusory fashion that the Purported Priming Loans were permitted under the

Prepetition Credit Agreement with the consent of the Required Lenders and the Prepetition Agent. *Id.*

76.     Following the Company's entry into two further amendments to the Prepetition Credit Agreement without Standard General's consent, counsel for Standard General sent a second letter to the Company's board of directors on October 4, 2016, repeating the concerns raised in its earlier letter and reiterating its objection to the validity and priority of the Purported Priming Loans.  *See* Ex. M, Letter from Shannon Selden, Debevoise & Plimpton LLP, to the Board of Directors of American Apparel, LLC (Oct. 4, 2016).  Standard General also noted that recent actions by the Company suggested that the Company's board of directors was failing to fulfill its fiduciary duties, including by incurring additional debt on an incremental basis at a time of severe financial distress for the Company without any indication that the board of directors had explored alternative options.  *Id.*

77.     Counsel for the Company responded by reiterating the Company's prior assertion that the Amendments complied with the Prepetition Credit Agreement, but again offered no support for this view.  *See* Ex. N, Letter from Scott J. Greenberg, Jones Day, to Shannon Selden, Debevoise & Plimpton LLP (Oct. 4, 2016).

**F.     Standard General's Efforts to Help the Company Maximize Value**

78.     While Standard General objected to the path being pursued by the Company and the Lender Committee, it also proactively sought to engage all of those parties regarding its ideas for recovery.  Specifically, Standard General made numerous efforts to assist the Company to identify opportunities for revenue growth and find alternatives for financing so as to maximize value.  Standard General's efforts, however, were repeatedly met by a lack of

timely communication and a seeming unwillingness by the Company, the Lender Committee, and their advisors to seriously entertain Standard General's proposals.

79.    In or around mid-August, Standard General learned that the Company had engaged Houlihan to pursue a sale of its assets.  Shortly thereafter, Standard General learned that the Company's liquidity issues were worse than it thought and that the Company was contemplating a second bankruptcy filing.  Standard General approached the Company and Houlihan regarding possible alternatives to a sale.  As part of its conversations with these parties, Standard General indicated, among other things, that it might be willing to subordinate its debt in exchange for equity in the Company.  Standard General received feedback, though, indicating that the Company had no interest in exploring options other than a sale of its assets. Nonetheless, Standard General made it clear that it was willing to consider ways to assist the Company.

80.    On several other occasions during September and October 2016, Standard General engaged with Houlihan as part of the sale process regarding a potential bid to purchase the Company's retail assets.  Standard General's proposals, however, were generally met with resistance and/or lapsed communication.  For example, in September 2016, Houlihan informed Standard General that it would connect Standard General with certain bidders for the Company's wholesale operations that were seeking potential partners to operate the retail business.  Standard General never received any further details from Houlihan regarding these bidders, nor were introductions to such bidders ever made, despite several follow-up attempts by Standard General.  Approximately a month later, towards the end of October 2016, Houlihan contacted Standard General regarding a prospective purchaser of the Company's intellectual property that was interested in a retail partner that would be willing to pay annual royalties to

license the intellectual property.  Although Standard General indicated its willingness to discuss the proposal, Houlihan never connected the parties.

81.     During this period, Standard General's efforts to engage directly with the Lender Committee in relation to the sale process were also largely rebuffed.  In mid-October, Standard General contacted the members of the Lender Committee and suggested that they should collectively credit bid for the Company's assets.  To facilitate that process, Standard General offered to form a holding company to accomplish the transaction for the benefit of all of the Prepetition Secured Lenders.  However, the Lender Committee was not supportive of this alternative.

82.     These examples are illustrative, but not exhaustive.  During the months leading up to the Company's second bankruptcy filing, Standard General was repeatedly shut out of the process and denied the information it requested – all while the Lender Committee embarked on the series of Amendments designed to prime Standard General's interests and diminish Standard General's recovery in the Company's inevitable second bankruptcy – in contravention of the express terms of the Prepetition Credit Agreement.

### G.    The Company Files for Bankruptcy Again and the Debtors Stipulate to the Validity of the Purported Priming Loans, Subject to a Challenge Period

83.     On November 14, 2016 (the "**Petition Date**"), unable to continue operating on the piecemeal funding being trickled into them by the Lender Committee, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[5]  On that same date, the Debtors filed a motion [D.I. 17][6]  (the "**DIP Motion**") seeking the approval of (i) DIP financing

---

[5]     The Debtors' bankruptcy filing constitutes an Event of Default under the Prepetition Credit Agreement.  *See* Ex. A, Prepetition Credit Agreement § 8.01(e).

[6]     Docket numbers refer to entries on the docket for *In re American Apparel, LLC, et al.*, Case No. 16-12551 (BLS) (Bankr. D. Del. filed Nov. 14, 2016).

that would prime certain collateral pledged to secure Standard General's Exit Loan and (ii) the use of the Prepetition Secured Lenders' cash collateral, in each case citing to the consent of only the Lender Committee.

84.    Standard General filed a limited objection to the DIP Motion [D.I. 54], objecting to the priming of any collateral securing its Exit Loan without its consent.  Standard General also brought to the Court's attention its disputes with the Lender Committee relating to the Purported Priming Loans and requested a broad reservation of rights to bring such disputes before the Court.

85.    Ultimately, the parties resolved Standard General's limited objection to the DIP Motion, with Standard General consenting to the priming of its share of certain collateral primarily related to the Accounts/Inventory Collateral, but not consenting to any priming with respect to its interests in the remaining collateral, consisting primarily of the IP Collateral and equipment.

86.    The Court entered an interim DIP financing order on November 17, 2016 [D.I. 114] and thereafter entered a final DIP financing order on December 12, 2016 [D.I. 299-2] (the "**Final DIP Order**").  The Final DIP Order reflects the compromise with Standard General by (i) providing that the DIP financing liens would not extend to the portion of the Prepetition Collateral representing 20% of the IP Collateral and equipment collateral (the "**Excluded Interests**"), so long as Standard General's Exit Loan remains outstanding, and (ii) setting forth a broad reservation of Standard General's rights.  *See* Final DIP Order ¶¶ 7, 21, 38.[7]

87.    The Final DIP Order also contained stipulations of the Debtors that, among other things, (i) the obligations under the Prepetition Credit Agreement, including the Purported

---

[7]    The interim DIP financing order contained substantially the same terms.

Priming Loans, and their attendant liens and security interests are valid, binding, enforceable and perfected obligations, liens and security interests and are not subject to avoidance, disallowance or subordination and (ii) the priority of payments under Section 2.01(e) of the Prepetition Credit Agreement, as modified by the Amendments, shall control the disposition of proceeds from collateral. *See* Final DIP Order ¶¶ E(5), (6), (7). The order provides that such stipulations will become binding and the claims, liens and security interests of the Prepetition Secured Parties, including the Lender Committee, will be finally allowed in the chapter 11 cases "*unless* a party . . . with standing and requisite authority, including Standard General L.P., has timely commenced a contested matter or adversary proceeding" (a "**Challenge**") by the earlier of seventy-five days after the Petition Date or sixty days after appointment of the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"). *Id.* ¶ 30. As a result, the Challenge Period expires on January 23, 2017.[8]

H.     **The Lender Committee Settles with the Creditors' Committee, the Litigation Trustee, and the Debtors, But Not with Standard General**

88.     Prior to entry of the Final DIP Order, the Creditors' Committee filed a limited objection [D.I. 238] (the "**Committee Objection**") seeking modifications to the proposed final DIP order, primarily with respect to the proposed protections for the Prepetition Secured Parties. In its objection, the Creditors' Committee targeted the pre-filing acts of the Lender Committee, asserting that "[t]he Prepetition Secured Parties were in complete control of American Apparel during this confoundingly tumultuous period and must not now be permitted to piggyback on the rights afforded to the DIP Secured Parties to insulate themselves from potential liability for this epic failure." Committee Objection at 2. The Creditors' Committee further contended that

---

[8]     The Committee was appointed on November 22, 2016. Sixty days from that date is Saturday, January 21, 2017. Therefore, the Challenge period expires on January 23, 2017. *See* Bankruptcy Rule 9006.

the proposed final DIP order improperly curtailed the Creditors' Committee's ability to investigate the prepetition conduct of the Prepetition Secured Parties and the Debtors' equity holders. *Id.*[9]

89.     The next day, the litigation trustee appointed in the Debtors' prior chapter 11 cases (the "**Litigation Trustee**") filed a motion to dismiss the current bankruptcy cases [D.I. 274] (the "**Motion to Dismiss**"), targeting the management of the Debtors, including the incurrence of additional debt at a time of distress, that led to their second bankruptcy filing.  The Litigation Trustee further contended that the Debtors' current bankruptcy cases were due to foreseeable circumstances that supported a finding that such cases were filed in bad faith.

90.     On January 4, 2017, the Debtors and the Creditors' Committee filed a joint motion [D.I. 428] seeking approval of a settlement [D.I. 428-1, Ex. 1] (the "**Settlement**") among the Debtors, the Lender Committee, the Creditors' Committee and the Litigation Trustee.  The Settlement provides for resolution of the Committee Objection, the Motion to Dismiss and potential litigation claims among the parties to the Settlement.  In this regard, the Settlement provides for broad releases to the members of the Lender Committee, the Prepetition Agent and each of their respective representatives from claims or causes of action that could be asserted against them by the Creditors' Committee, the Litigation Trustee and the Debtors, including any Challenges under the Final DIP Order.  Settlement ¶ 6.  [D.I. 428-1, Ex. 1].  The Settlement provides no such releases for Standard General.

91.     As consideration for the Settlement, the members of the Lender Committee agreed to waive their unsecured deficiency claims against the Debtors and consented to the

---

[9]     Standard General filed a reply to the Committee Objection, clarifying that Standard General is differently positioned than the Lender Committee and did not control or participate in the management of the Debtors' businesses following their emergence from the prior bankruptcy case.  [D.I. 275].

establishment of three escrows from the proceeds of the Debtors' collateral: first, an escrow of amounts sufficient to pay the Debtors' post-petition stub rent; second, an escrow of amounts sufficient to pay claims against the Debtors arising under Section 503(b)(9) of the Bankruptcy Code; and, third, an escrow of $2.5 million for the benefit of the Debtors' general unsecured creditors and the beneficiaries of the litigation trust established in the Debtors' prior chapter 11 cases.

92.     The Settlement was negotiated entirely by the Lender Committee without the participation of Standard General, which is not a party to the Settlement.  Notwithstanding that the Settlement provides releases only to the Lender Committee, the escrows for the Settlement are to be established from the proceeds from the sales of all of the Debtors' assets, including the collateral securing Standard General's Exit Loan.

93.     In an effort to reach a consensual resolution of its issues relating to the Settlement, Standard General engaged in extensive discussions regarding the Settlement with counsel for the Lender Committee, the Creditors' Committee, the Litigation Trustee, and the Debtors.  Standard General also filed a limited objection [D.I. 466] to the Settlement in the midst of such negotiations.

94.     Ultimately, the parties to the Settlement consented to certain modifications to the Settlement, the Settlement order, and the final cash collateral order, that (i) preserved for future resolution by the Court the issue of how the financial burden of the Settlement should be allocated as between Standard General and the Lender Committee,[10] and (ii) clarified that Standard General's rights and claims against the Lender Committee, including its right to assert

---

[10]    Standard General intends to seek appropriate relief from the Court at a later time with respect to the allocation of the costs and expenses of the Settlement, as well as the allocation of the costs and expenses of the sales of the Debtors' assets, unless there is a consensual agreement among the parties as to such issues.

Challenges based upon breach of contract, recharacterization and equitable subordination, were not being waived, released or prejudiced by the Settlement.  Settlement Order ¶ 7.  [D.I. 493].

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

95.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 94 above and incorporate them into this Count as if fully set forth herein.

96.     The Prepetition Credit Agreement is a valid, binding and enforceable contract, made for valid consideration and governed by the laws of New York.

97.     Plaintiffs have fully performed all of their obligations under the Prepetition Credit Agreement.

98.     Under the Prepetition Credit Agreement, Plaintiffs' $25.8 million Exit Loan, and all accrued interest, is secured by a first priority lien on assets of the Debtors, including the Accounts/Inventory Collateral and the IP Collateral, subject to certain permitted liens as specified in the Prepetition Credit Agreement.

99.     Pursuant to the terms of the Prepetition Credit Agreement, certain amendments, waivers or consents require the consent of 100% of the Prepetition Secured Lenders thereunder, including amendments, waivers or consents that would: (i) alter the pro rata sharing of payments or the order of the application of payments required by Section 2.13 or Section 8.03 of the Prepetition Credit Agreement (Section 10.01(d)(i)); (ii) change any provision of Section 10.01 (which specifies the amendments requiring 100% lender consent) or change the definition of "Required Lenders" or any other provision specifying the number or percentage of lenders required to amend, waive or otherwise modify any rights granted under the Prepetition Credit Agreement (Section 10.01(e));  (iii) subordinate the obligations under the Prepetition Credit Agreement to any other indebtedness (Section 10.01(f)(iii)), and (iv) subordinate the liens on all

or substantially all of the Prepetition Collateral pledged under the Prepetition Credit Agreement to any other lien (Section 10.01(f)(iv)).

100.    Defendants did not seek, or obtain, Plaintiffs' consent before entering into any of the Amendments to the Prepetition Credit Agreement.  Defendants also did not provide notice of the Amendments, as required by Section 6.05.

101.    Defendants have materially breached the terms of the Prepetition Credit Agreement by entering into the Amendments to the Prepetition Credit Agreement, without Standard General's consent and without notice as required by the Prepetition Credit Agreement.

102.    As a direct result of the Defendants' breach of their contractual obligations, unless the claims of the Lender Committee are disallowed or subordinated, Plaintiffs will suffer substantial damages, including in the form of subordination of their secured claims under the terms of the Prepetition Credit Agreement.  Defendants are liable to Plaintiffs for these damages plus all fees, costs and expenses incurred by Plaintiffs in enforcing their rights.

### SECOND CAUSE OF ACTION:
### BREACH OF IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING

103.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 102 above and incorporate them into this Count as if fully set forth herein.

104.    The law implies in every contract an implied covenant of good faith and fair dealing.

105.    Defendants' actions, as described above, including entry into each of the Amendments effectuating the Purported Priming Loans, constitute a breach of this implied covenant, in that such actions were designed to deprive Standard General of the benefits to which it is entitled under the Prepetition Credit Agreement.

106.    Standard General has been damaged by Defendants' breach of the covenant of good faith and fair dealing implied in the Prepetition Credit Agreement, including in the form of subordination of their secured claims under the terms of the Prepetition Credit Agreement, in an amount to be determined at trial, plus all fees, costs and expenses incurred in enforcing Standard General's rights.

### THIRD CAUSE OF ACTION:
### RECHARACTERIZATION

107.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 106 above and incorporate them into this Count as if fully set forth herein.

108.    The Purported Priming Loans, while asserted to be debt owed by the Company to the Lender Committee, are, in reality, equity contributions, and should be recharacterized as equity interests.

109.    The Lender Committee members were at all relevant times insiders of the Company, with dominion and control over the Company's financial and operational affairs. Since the Company's emergence from its first bankruptcy case in February 2016 through its second bankruptcy filing on November 14, 2016, the Lender Committee members have controlled the board of the Company and the vast majority of the Company's equity.

110.    Upon information and belief, at all relevant times during which the Amendments were entered into and the Purported Priming Loans made, the Company was inadequately capitalized, overleveraged, and unable to pay its debts as they became due.

111.    Upon information and belief, Defendants were well aware that there was no source of repayment for the Purported Priming Loans because of the Company's financial state when the Purported Priming Loans were made.  Indeed, several of the Purported Priming Loans were accompanied by amendments to the imminent maturity date for the prior loans, in

recognition that the Company was not capable of paying its debts pursuant to the Purported Priming Loans as they became due.  The inadequacy of capitalization is further clear given the need to trickle funds into the Company's business operations, through ongoing cash infusions made by the Lender Committee over the seven-month span of the Purported Priming Loans.

112.    Upon information and belief, Defendants did not expect repayment of the Purported Priming Loans by the Company unless a potential purchaser for the Company and/or its assets materialized.  Upon information and belief, Defendants knew that the Company was in financial distress when they entered into the Purported Priming Loans, and without an imminent or likely sale, the only source of funds available to repay the Purported Priming Loans was additional Purported Priming Loans.

113.    Upon information and belief, Defendants never intended to enforce a maturity date for the Purported Priming Loans.  Indeed, Defendants' continual amendment of the Prepetition Credit Agreement to extend the maturity date (while accruing further debt) of the Purported Priming Loans belies the existence of any intent for such loans to mature.

114.    Upon information and belief, the Company and Defendants did not abide by any schedule or plan to pay down the debt under the Purported Priming Loans.  To the contrary, the Company and Defendants entered into additional amendments to the Prepetition Credit Agreement that *increased* the Company's debt, by roughly $82 million between April and October 2016, rather than following a plan of payment to reduce outstanding debts.

115.    Defendants loaned money to the Company when no other lender would have done so given the Company's dire financial straits and demonstrated inability to earn a profit.  Indeed, the Purported Priming Loans were entered into because the Company was unable to find a third

party willing to provide the Revolving Facility permitted under the Prepetition Credit Agreement.

116.    The Company did not pledge any new collateral to support the Purported Priming Loans.  Instead, it pledged the same collateral securing the Exit Loans under the Prepetition Credit Agreement to secure all additional purported debt incurred pursuant to the Amendments.

117.    The Amendments were not arms'-length transactions.  At all relevant times that the Purported Priming Loans were entered into, the Lender Committee held more than 90% of the Company's equity, controlled the Company's board, and managed day-to-day decision-making for the Company.  Indeed, the only Prepetition Secured Lender that was not involved in the management of the Company – Standard General – was neither informed about nor offered the opportunity to participate in the majority of the Amendments.

118.    Although the Purported Priming Loans purport to be secured by a first priority lien in substantially all of the collateral granted under the Prepetition Credit Agreement, Plaintiffs never consented to the Purported Priming Loans or any amendments to the Prepetition Credit Agreement.

119.    To allow Defendants to characterize the Purported Priming Loans as debt would result in injury to Standard General, in its capacity as a secured lender under the Prepetition Credit Agreement, and as the largest unsecured creditor of the Company.  It would also confer an unfair advantage on Defendants by allowing Defendants to reap the fruits of the inequitable conduct in which they engaged.

120.    The recharacterization of the Purported Priming Loans from debt to equity interests is consistent with the policies of the Bankruptcy Code.

121.    The Purported Priming Loans should be treated in their entirety as equity interests

that rank below the claims of all of the Debtors' creditors, including Standard General.

### FOURTH CAUSE OF ACTION:
### EQUITABLE SUBORDINATION

122.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1

through 121 above and incorporate them into this Count as if fully set forth herein.

123.    The equities in this case demand that any amounts allegedly owed to Defendants

on account of their loans to the Company, including the Purported Priming Loans and their Exit

Loans under the Prepetition Credit Agreement, should be subordinated to all other claims under

11 U.S.C. § 510(c)(1).

124.    The Lender Committee members were at all relevant times insiders of the

Company, with dominion and control over the Company's financial and operational affairs.

Since the Company's emergence from its first bankruptcy case in February 2016, the Lender

Committee members have controlled the board of the Company and the vast majority of the

Company's equity.

125.    The conduct of Defendants, as alleged herein, constitutes inequitable conduct.

126.    Defendants' inequitable conduct gave Defendants an unfair advantage as

claimants in these chapter 11 cases.

127.    In part, by reason of the conduct of Defendants, the Company was

undercapitalized, drowning in debt, and unable to satisfy its obligations to its other creditors,

including Standard General (both as a secured lender and an unsecured creditor) and other

unsecured creditors, thereby harming the Company's creditors.

128.    The Purported Priming Loans, which purport to prime Standard General's interest

in the Prepetition Collateral and were entered into without Standard General's consent in

contravention of the clear terms of the Prepetition Credit Agreement, were part of an attempt to prolong the Company's business without adequate working capital, while the Lender Committee sought a potential buyer that would allow them a return on their equity, when the Company should have immediately filed for bankruptcy protection.  At or around the time of each of the Amendments, Defendants knew or should have known that without an additional equity infusion to the Company, a subsequent bankruptcy filing was inevitable, and the costs of failure would be imposed in part on creditors, customers, employees, and other constituents of the Company.

129.    Allowing Defendants to receive payment on the claims relating to their Exit Loans and the Purported Priming Loans prior to or along with the general unsecured creditors would be unfair and inequitable.  In particular, allowing the Lender Committee to be paid prior to or with the general unsecured creditors would allow Defendants to reap the benefits of their inequitable conduct as alleged above.

130.    Equitable subordination of the claims of Defendants is consistent with the provisions of the Bankruptcy Code.

131.    Because of the inequitable conduct described herein, the claims of Defendants stemming from all of their loans to the Company, including the Purported Priming Loans and their Exit Loans under the Prepetition Credit Agreement, should be equitably subordinated to all general unsecured claims pursuant to § 510(c) of the Bankruptcy Code.

### FIFTH CAUSE OF ACTION:
### OBJECTION TO CLAIM

132.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 above and incorporate them into this Count as if fully set forth herein.

133.    The secured claims of Defendants on account of the Purported Priming Loans should be disallowed because they do not meet the requirements for allowance of a secured claim pursuant to 11 U.S.C. § 502.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants as follows:

(a)    On Count One, judgment that the security interests granted pursuant to the Purported Priming Loans are in violation of the terms of the Prepetition Credit Agreement and are subordinate to liens securing the Plaintiffs' Exit Loan and the Prepetition Credit Agreement and damages for Defendants' breach of contract;

(b)    On Count Two, judgment that the security interests granted pursuant to the Purported Priming Loans are in violation of the terms of the Prepetition Credit Agreement and are subordinate to liens securing the Plaintiffs' Exit Loan and the Prepetition Credit Agreement and damages for Defendants' breach of the implied covenant of good faith and fair dealing;

(c)    On Count Three, judgment that the Purported Priming Loans should be treated as equity interests that rank below the claims of the Debtors' creditors;

(d)    On Count Four, judgment subordinating all of Defendants' claims asserted against the Debtors relating to the Lender Committee's Exit Loans and the Purported Priming Loans to all general unsecured claims;

(e)    On Count Five, judgment disallowing any secured claims by Defendants on account of the Purported Priming Loans;

(f)    On all Counts, judgment awarding Plaintiffs all fees, costs and expenses incurred in enforcing their rights;

(g)      On all Counts, judgment awarding (i) interest as allowed by applicable law;

(ii) costs of suit incurred herein; and (iii) attorneys' fees; and

(h)      On all Counts, awarding Plaintiffs such other and further relief as the Court

deems just and proper.

Dated:  January 23, 2017
Wilmington, Delaware          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                              */s/ Edmon L. Morton*
                              Edmon L. Morton (No. 3856)
                              Joseph M. Barry (No. 4221)
                              Michael S. Neiburg (No. 5275)
                              Elizabeth S. Justison (No. 5911)
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801
                              Tel: (302) 571-6600
                              Fax: (302) 571-1253
                              Email: emorton@ycst.com
                                      jbarry@ycst.com

                              *Counsel to Standard General L.P. and its affiliates*